IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JOHN PATRICK DUDLEY, #220840 )
              )
    Plaintiff,     )
              )
  v.         )  CASE NO. 2:15-cv-287-MHT
              )  [WO]
SGT. CALVIN, *et al.*,    )
              )
    Defendants.   )

## RECOMMENDATION OF THE MAGISTRATE JUDGE

## I. INTRODUCTION

Plaintiff John Patrick Dudley ("Plaintiff") is an inmate of the Alabama Department of Corrections. He filed this action under 42 U.S.C. § 1983, alleging that while he was an inmate at Staton Correctional Facility ("Staton") in Elmore, Alabama, Defendants Terrence Calvin and William Tate failed to protect him from assault by another inmate, Marcus Brown.[1] Doc. 1. Plaintiff sues Defendants in their official and individual capacities. Doc. 23 at 1. Plaintiff requests declaratory relief and damages. Doc. 1 at 3 & 7.

Defendants filed an answer, special report, and evidentiary materials addressing Plaintiff's claims for relief. Docs. 17 & 21. Upon receipt of Defendants' report, the court directed Plaintiff to file a response, including sworn affidavits and other evidentiary materials, and specifically cautioned Plaintiff that "at some time in the future the court will

---

[1] All other defendants, claims, and requests for relief were previously denied or dismissed. Docs. 10, 16 & 27.

treat Defendants' report and Plaintiff's response as a dispositive motion and response." Doc. 22. Plaintiff responded to Defendants' report and materials. Doc. 23.

The court now will treat Defendants' report as a motion for summary judgment. Upon consideration of the motion, the response, and the evidentiary materials filed, the court concludes that Defendants' motion for summary judgment is due to be granted.

## II. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation omitted). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by presenting evidence indicating that there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–24.

Defendants have met their evidentiary burden and demonstrated the absence of any

genuine dispute of material fact. Thus, the burden shifts to Plaintiff to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to the case exists. *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact [by citing to materials in the record including affidavits, relevant documents or other materials], the court may . . . grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it . . . ."); *see also Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014) (holding that the court should consider facts pled in a plaintiff's sworn complaint when considering summary judgment). A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable factfinder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263. The evidence must be admissible at trial, and if the nonmoving party's evidence "is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986); Fed. R. Civ. P. 56(e). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice . . . ." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252). Only disputes involving material facts are relevant, and what is material is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248. To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could

not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255; *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) ("To be sure, [plaintiff's] sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage. . . . 'Courts routinely and properly deny summary judgment on the basis of a party's sworn testimony even though it is self-serving.'") (citation omitted). "Conclusory, uncorroborated allegations by a plaintiff in an affidavit or deposition will not create an issue of fact for trial sufficient to defeat a well supported summary judgment motion." *Solliday v. Fed. Officers*, 413 F. App'x 206, 207 (11th Cir. 2011) (citing *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990)); *see also Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (holding that conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine dispute of material fact). Although factual inferences must be viewed in a light most favorable to the nonmoving party and *pro se* complaints are entitled to liberal interpretation by the court, a *pro se* litigant does not escape the burden of sufficiently establishing a genuine dispute of material fact. *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Thus, a plaintiff's *pro se* status alone does not mandate this court's disregard of elementary principles of production and proof in a civil case. Here, Plaintiff fails to demonstrate a requisite genuine dispute of material so as to preclude summary judgment on his claims against Defendants. *See*

*Matsushita*, 475 U.S. at 587.

## III. DISCUSSION

### A.    Absolute Immunity

Official capacity lawsuits are "in all respects other than name, . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). State officials may not be sued in their official capacity for money damages unless the state has waived its Eleventh Amendment immunity or Congress has abrogated the state's immunity, and neither has occurred in this case. *See Lancaster v. Monroe Cnty.*, 116 F.3d 1419, 1429 (11th Cir. 1997) (citing *Seminole Tribe v. Florida*, 517 U.S. 44, 59 (1996) (discussing abrogation by Congress); *Pennhurst St. Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) (discussing Eleventh Amendment immunity); *Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (finding that Alabama has not waived Eleventh Amendment immunity)). In light of the foregoing, the court concludes that Defendants are state actors entitled to sovereign immunity under the Eleventh Amendment for Plaintiff's claims seeking monetary damages from them in their official capacities. To the extent Plaintiff sues Defendants in their official capacities, the claims for money damages brought against Defendants in their official capacities are therefore due to be dismissed.

### B.    Declaratory Relief

Plaintiff initially sought a declaration that Defendants violated the United States Constitution and laws. Doc. 1 at 7. But Plaintiff is no longer incarcerated at Staton. Doc. 33. The transfer or release of a prisoner renders moot any claims for injunctive or

declaratory relief. *See Cnty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979); *see also Cotterall v. Paul*, 755 F.2d 777, 780 (11th Cir. 1985) (holding that past exposure to illegal conduct does not in and of itself show a pending case or controversy regarding injunctive relief if unaccompanied by any continuing present injury or real and immediate threat of repeated injury). Consequently, Plaintiff's request for equitable relief is due to be dismissed as moot.

## C.    Deliberate Indifference—Failure to Protect

Plaintiff claims that Defendants were deliberately indifferent to his safety when they failed to protect him from assault by inmate Brown. Tate argues that Plaintiff lacks standing and fails to state a claim against him because Plaintiff suffered no legal injury caused by him. Doc. 21 at 3. Defendants further argue Plaintiff cannot show that they had sufficient and knowledge of a risk of harm to Plaintiff, that they acted unreasonably, or that they caused Plaintiff harm. Doc. 21 at 4. In addition, Defendants argue that they are entitled to qualified immunity on Plaintiff's claim against them in their individual capacities for monetary damages. Doc. 21 at 4.

### 1.    *Qualified Immunity*

Qualified immunity offers complete protection from civil damages for government officials sued in their individual capacities if their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity is not merely a defense against liability but rather

immunity from suit, and the Supreme Court "repeatedly [has] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009) (quotation marks and citations omitted). To receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). There is no dispute that Defendants were acting within the course and scope of their discretionary authority when the incidents complained of occurred. Plaintiff must, therefore, allege facts that, when read in a light most favorable to him, show that Defendants are not entitled to qualified immunity. *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003).

To satisfy his burden, Plaintiff must show (1) that a defendant committed a constitutional violation and (2) that the constitutional right a defendant violated was "clearly established." *Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1332 (11th Cir. 2004). "To be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right. In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (quotation marks and citations omitted). "Clearly established law" means (1) "a materially similar case has already been decided"; (2) "a broader, clearly established principle that should control the novel facts of the situation"; or (3) "the conduct involved in the case may so obviously violate the constitution that prior case law is unnecessary." *Gaines v. Wardynski*, 871 F.3d 1203,

1208–09 (11th Cir. 2017) (quotation marks and citations omitted). The controlling case law is from "the United States Supreme Court, the Eleventh Circuit, or the highest court in the relevant state." *See id.* at 1209. "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quotation marks and citations omitted). The Court of Appeals for the Eleventh Circuit "has stated many times that if case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Gaines*, 871 F.3d at 1210. "Exact factual identity with the previously decided case is not required, but the unlawfulness of the conduct must be apparent from pre-existing law." *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011). If Plaintiff cannot establish both elements, Defendants are entitled to qualified immunity, and the court may analyze the elements "in whatever order is deemed most appropriate for the case." *Rehberg v. Paulk*, 611 F.3d 828, 839 (11th Cir. 2010) (citing *Pearson*, 555 U.S. at 241–42).

## 2.    *Summary of Material Facts*

In their affidavits, Defendants dispute whether they were warned before the inmate attack. For purposes of considering Defendants' motion for summary judgment, however, the court views the facts in the light most favorable to Plaintiff,[2] the nonmoving party.

---

[2] Plaintiff's statements in the response to Defendants' report are not sworn under oath or penalty of perjury. Doc. 23. Even considering them to be undisputed, however, Defendants are entitled to summary judgment. Fed. R. Civ. P. 56(e)(2)–(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . (2) consider the facts

Plaintiff was an inmate at Staton in December 2014. During the time relevant to his claims, Calvin was a Correctional Sergeant at Staton and Tate was a Correctional Lieutenant at Staton. Docs. 21-5 & 21-7.

According to Plaintiff's verified complaint, on December 16, 2014, Plaintiff was housed in D dorm, and he approached Correctional Officer Cole in D dorm and told Cole "that I was going to be assaulted that day by inmate Marcus Brown, #259755." Doc. 1 at 3. According to Plaintiff, Cole called Calvin and escorted Plaintiff to the shift office. *Id.* After Plaintiff informed Calvin of these facts, Calvin "threatened to beat my ass and ran me back to the dorm." Doc. 1 at 3.

Plaintiff states he then called his father, John Evan Dudley, and told him about the threat. Doc. 1 at 8. At about 1:00 p.m., Plaintiff alleges that his father called Staton, spoke with Calvin, and explained the threat. Doc. 1 at 8. According to Plaintiff, Calvin told Plaintiff's father "there was nothing they could do to help me at all." Doc. 1 at 8. Plaintiff states he called his father at about 1:30 p.m., and his father reported what Calvin said. Doc. 1 at 8. At about 1:45 p.m., Plaintiff returned "to the shift office in hopes that my dad having called would help to show the seriousness of the situation and was once again ran out of the shift office and threatened with physical bodily harm by Sgt. Calvin and told to go back to my dorm." Doc. 1 at 8.

Plaintiff submitted a statement from his father, sworn under penalty of perjury, that

---

undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it . . . .").

does not exactly corroborate Plaintiff's version. John Evan Dudley avers Plaintiff called him about 12:30 p.m. on December 16, 2014, reporting that someone threatened Plaintiff with assault, and asking his father "to call the shift office and try to get him some protection from this assa[u]lt threat." Doc. 1-1 at 5. Plaintiff's father states that he called the shift office at about 1:35 p.m. and spoke with Calvin, who "assured me that he'd promptly call John up there and take care of the situation." Doc. 1-1 at 5. Plaintiff's father states that Plaintiff called him again at about 1:45 p.m., and Plaintiff "seemed to be in a state of urgency and some what [sic] afraid. I told John what Sergeant Calvin had told me and that I felt like the problem would be handled in a timely fashion. In the end result, John did not receive any help at all and was sent back to his dorm at which time he got assaulted." Doc. 1-1 at 5–6.

Shortly after 3:00 p.m. that day, Brown, a fellow inmate housed in F dorm, entered D dorm, went to Plaintiff's living quarters, and punched Plaintiff several times on the right side of his head, causing Plaintiff's head to hit the metal bunk bed railings and cutting his head. Doc. 1 at 8. Plaintiff ran to Cole, who took Plaintiff to Calvin. Doc. 1 at 8. According to Plaintiff, Calvin told Plaintiff, "It is your fault." Doc. 1 at 8. He continued, "Maybe you will learn a lesson before borrowing peoples [sic] money again." Doc. 1 at 8. Calvin escorted Plaintiff to the Health Care Unit ("HCU"), where Plaintiff received a medical body chart of his injuries. Doc. 1 at 8.

According to Plaintiff, he stayed in the HCU "for several days." Doc. 1 at 8. Plaintiff states that while in HCU Tate approached Plaintiff and "further emphasized that the

incident was my fault and that I shouldn't be borrowing peoples [sic] money and begged me to sign a living agreement at which time I refused." Doc. 1 at 8. Defendants submitted a copy of an "Inmate Living Agreement" signed by Plaintiff only and dated December 19, 2014. Doc. 21-2 at 4. This document includes signature lines for up to four inmates and a witness. Doc. 21-2 at 4. It acknowledges that the inmates have been orally reprimanded concerning their disagreement; they "relieve any and all Department of Corrections Officials of any liabilities and damages"; they acknowledge they have worked out their problems and "can live at this institution without violence existing between us"; they acknowledge they understand that, despite signing the agreement, "disciplinary actions may still be taken against" them; and they acknowledge making the statement of their "own free will without threats or promise from anyone." Doc. 21-2 at 4. Plaintiff states he "didn't feel comfortable signing a living agreement because it was very obvious that I am not safe." Doc. 1 at 8–9.

Plaintiff was told to pack up his belongings and go to the lock-up cells, which were all full. Doc. 1 at 9. Plaintiff asserts he was told he "would be forced to sleep on the floor outside of the lock-up cells with no toilet, no running water and no bed if I did not sign the living agreement." Doc. 1 at 9. As a result, Plaintiff signed the living agreement and notified his father of the facts. Doc. 1 at 9.

According to Plaintiff's later statement, he "was held in medical observation for twenty-four hours and then forced to sleep on the floor in front of the actual segregation unit for three days—not less than an hour—as is stated in the defendants written report."

Doc. 23 at 2. Plaintiff asserts Tate "indirectly forced me to sign a living agreement that Plaintiff had already said he did not want to sign and was placed in inhumane conditions until he complied." Doc. 23 at 3. Plaintiff states that Tate approached him with the living agreement on the day of the assault. Doc. 23 at 3–4. However, the signed living agreement is dated December 19, 2014. Doc. 21-2 at 4.

Calvin avers he was notified after, not before, the incident. Doc. 21-5 at 2. Calvin avers:

> On December 16, 2014, he did not tell me before the incident that he was going to be assaulted by another inmate. Inmate Dudley is alleging his father called and advised Sergeant Calvin that his son was going to be assaulted by another inmate. Sergeant Calvin has no recollection of talking with Inmate Dudley's father.

Doc. 21-5 at 2.

According to an "Incident Report" that Calvin wrote, the event was reported on December 17, 2014 even though the "Narrative Summary" portion of the report indicates that the incident occurred on December 16, 2014. Doc. 21-2 at 2. Calvin also completed a "Duty Officer Report" that dates the incident on December 17, but the narrative indicates it happened on December 16. Doc. 21-2 at 3. According to the Duty Officer Report, Plaintiff informed Correctional Officer Cole at 4:44 p.m. on December 16 that Plaintiff was in a fight with another inmate. Doc. 21-2 at 3. Cole contacted Calvin via hand-held radio. Doc. 21-2 at 3. At 4:48 p.m., Calvin escorted Plaintiff to the HCU, where Calvin questioned Plaintiff. At 4:49 p.m., Calvin took pictures of the injuries, reprimanded Plaintiff, and informed Plaintiff that disciplinary action would be initiated against him.

Doc. 21-2 at 3. The HCU nurse completed a body chart on Plaintiff. Doc. 21-2 at 3. Plaintiff refused to sign a living agreement and was assigned to the Medical Observation Unit for further observation. Doc. 21-2 at 3. At about 6:00 p.m., Calvin questioned Brown, who said Plaintiff owed him fifteen cigarette tops and who admitted slapping Plaintiff, causing him to fall and hit his head on the bed. Doc. 21-2 at 3. At about 6:25 p.m., Calvin took Brown to the HCU for treatment. Doc. 21-2 at 3. Calvin then reprimanded both Brown and Plaintiff, and Brown signed a living agreement. Doc. 21-2 at 3. At about 6:26 p.m., Calvin informed Tate of the incident. Doc. 21-2 at 3.

Cole, who is not a defendant in this case, avers that the incident "was not reported before it happened." Doc. 21-4 at 2. Cole states:

> On December 16, 2014, inmate Dudley reported he had been attacked by an inmate and he feared for his life and safety. The incident was reported to the shift office and the incident was investigated. After completing the investigation, it was determined that inmate Dudley owed the inmate that assaulted him.

Doc. 21-4 at 2.

Tate denies violating Plaintiff's due process rights and denies failing to protect Plaintiff from physical brutality. Doc. 21-7 at 2. Tate avers that Plaintiff "did not tell me before the incident he was going to be assaulted by another inmate. I asked Inmate Dudley if he wanted to sign a living agreement and he refused. Therefore per ADOC regulations, I advised him he would have to be placed in a holding cell. Inmate Dudley then signed a living agreement, due to not wanted to be placed in a holding cell. . . . I was not notified before the incident. I was informed after the incident took place." Doc. 21-7 at 2.

Calvin wrote Plaintiff and Brown each a disciplinary report for fighting without a weapon. Docs. 21-1 at 5 & 21-3 at 3. The reports indicate that the incident happened on December 17, 2014, but again the factual description of the incident states that it happened on December 16, 2014. Docs. 21-1 at 5 & 21-3 at 3. Plaintiff was found not guilty. Doc. 21-1 at 8. The hearing officer wrote:

> The Hearing Officer chose not to accept the sworn testimony as fact that on December 16, 2014 at approximately 4:44 p.m., Sergeant Calvin questioned Inmate Dudley about the incident. Inmate Dudley informed Sergeant Calvin he was involved in a physical altercation with inmate Marcus Brown BM/259755. Inmate Dudley alleged he was slapped in the face causing him to fall and hit his head against the bed. Inmate Dudley informed Sergeant Calvin he owes Brown (15) cigarette tops. Inmate Dudley is not guilty of fighting without a weapon as he was not an active participant in the altercation.

Doc. 21-1 at 8. Inmate Brown admitted he was guilty of fighting without a weapon and disciplined. Doc. 21-3 at 6.

Medical records from Staton indicate that the incident happened on December 17, 2014. Doc. 21-6. The inmate body chart is dated December 17 at 4:50 p.m. Doc. 21-6 at 7. It indicates Plaintiff received a "superficial laceration to (L) side of head 2 inches long." Docs. 21-6 at 7 & 21-2 at 7–8. Plaintiff was ordered to be monitored for 23 hours in the Medical Observation Unit ("MOU") until a provider could see him the next morning. Doc. 21-6 at 3–6 & 13. On December 18, 2014, Plaintiff was released to return "back to camp." Doc. 21-6 at 13. Plaintiff was supposed to see the nurse on December 19, 2014, but did not show. Doc. 21-6 at 3 & 13. Plaintiff's Inmate Movement History indicates that on

December 19, 2014, Plaintiff was moved to bed B1–142B at about 5:20 p.m., then to "holding" at about 6:06 p.m., then to bed B1–3A a minute later. Doc. 21-1 at 4.

### 3.    Discussion—Failure to Protect

"A prison official's duty under the Eighth Amendment is to ensure reasonable safety, a standard that incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions." *Farmer v. Brennan*, 511 U.S. 825, 844–45 (1994) (internal quotation marks and citations omitted). "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Id*. at 834. Officials responsible for prison inmates may be held liable under the Eighth Amendment for acting with "deliberate indifference" to an inmate's safety when the official knows that the inmate faces "a substantial risk of serious harm" and with that knowledge disregards the known risk by failing to take reasonable measures to abate it. *Id*. at 828. "Within [a prison's] volatile 'community,' prison administrators are to take all necessary steps to ensure the safety of . . . the prison staffs and administrative personnel. . . . They are [also] under an obligation to take reasonable measures to guarantee the safety of the inmates themselves." *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984). The Eleventh Circuit has, however, stressed that a "prison custodian is not the guarantor of a prisoner's safety." *Popham v. City of Talladega*, 908 F.2d 1561, 1564 (11th Cir. 1990); *Purcell ex rel. Estate of Morgan v. Toombs Cnty., Ga.*, 400 F.3d 1313 (11th Cir. 2005) (same). "Only '[a] prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate

violates the Eighth Amendment.'" *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014) (quoting *Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1028–29 (11th Cir. 2001)).

The law is settled that both objective and subjective elements are necessary components of a violation of the protections afforded by the Eighth Amendment. *Caldwell*, 748 F.3d 1099. With respect to the objective elements of a deliberate indifference claim, an inmate must first show that "an objectively substantial risk of serious harm" existed. Second, once it is established that the official [was] aware of this substantial risk, the official must [have] react[ed] to this risk in an objectively unreasonable manner." *Marsh*, 268 F.3d at 1028–29. As to the subjective elements, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. . . . The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.' . . . [A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 837–38. The conduct at issue "must involve more than ordinary lack of due care for the prisoner's interests or safety. . . . It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, [providing security for inmates], or restoring official control over a tumultuous cellblock." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

16

A defendant's subjective knowledge of the risk must be specific to that defendant because "imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference. . . . Each individual Defendant must be judged separately" and on the basis of what that person knew at the time of the incident. *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008). Moreover, "[t]he known risk of injury must be a strong likelihood, rather than a mere possibility before a [state official's] failure to act can constitute deliberate indifference." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (internal citations and quotation marks omitted). "Merely negligent failure to protect an inmate from attack does not justify liability under section 1983." *Id.*; *see also Harris v. Prison Health Servs.*, 706 F. App'x 945, 951–52 (11th Cir. 2017) (recognizing conflicting circuit precedent on deliberate indifference standard, but concluding the controlling standard is "more than mere negligence" not "more than gross negligence") (citing *Melton v. Abston*, 841 F.3d 1207, 1226 n.2 (11th Cir. 2016)). Thus, a prison official may avoid Eighth Amendment liability for failure to protect an inmate in any one of three ways: (1) by demonstrating that the official was not aware "of the underlying facts indicating a sufficiently substantial danger" and was "therefore unaware of a danger"; (2) by admitting awareness of "the underlying facts" of a substantial danger, but "believ[ing] (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent"; or (3) by showing that the official "responded reasonably" to a known substantial danger, "even if the harm ultimately was not averted." *Rodriguez v. Sec'y for Dep't of Corr.*, 508

F.3d 611, 618 (11th Cir. 2007) (quoting *Farmer*, 511 U.S. at 844) (internal quotation marks omitted).

Consequently, to proceed beyond the properly supported motion for summary judgment filed by Defendants, Plaintiff must provide evidence that an objectively substantial risk of serious harm existed toward him from his attacker and that Defendants disregarded that known risk by failing to respond to it in an objectively reasonable manner. If he establishes these objective elements, Plaintiff also must satisfy the subjective component. To do so, Plaintiff must submit evidence showing that Defendants subjectively knew that Plaintiff faced a substantial risk of serious harm—that is, Defendants were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and they drew the inference. *See Caldwell*, 748 F.3d at 1099–1100 (quoting *Farmer*, 511 U.S. at 837).

### a.    Defendant Tate

It is undisputed that Tate was not involved in the events leading up to the assault. Consequently, Tate cannot be liable for failing to protect Plaintiff from the assault by a fellow inmate.

To the extent Plaintiff claims that Tate exposed him to danger after the assault by forcing him to sleep on the floor outside the full lockup cells until he signed a living agreement, it is undisputed that Plaintiff was not attacked while he slept and thus suffered no physical injury related to Tate's failure to protect Plaintiff. Moreover, sleeping on the floor for several nights without access to a toilet, running water, or bed does not offend

"the civilized measure of life's necessities." *See Rhodes v. Chapman*, 452 U.S. 337, 347 (1981) (quotation marks omitted); *Hutto v. Finney*, 437 U.S. 678, 686–87 (1978) ("A filthy, overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months."). Tate did not force Plaintiff into signing the living agreement but rather gave Plaintiff the option of not signing it. Plaintiff's willingness to sign the agreement provided some assurance that the danger posed by Brown had passed. Thus, Tate's act in obtaining assent to the living agreement raises only a question whether Tate was negligent in allowing the inmates in proximity to one another, not deliberately indifferent. *Cf. Farmer*, 511 U.S. at 844; *Swain v. Peterson*, 2016 WL 8603657, at *7 (N.D. Ala. Dec. 21, 2016) (noting that the plaintiff's "willingness to sign the Living Agreement gave the defendants at least some assurance that the danger had passed. . . . [and] their action in getting [him] to sign the Living Agreement . . . raises only a question of negligence, not deliberate indifference"), *adopted*, 2017 WL 1076452 (N.D. Ala. Mar. 22, 2017). Plaintiff fails to meet his burden of demonstrating a constitutional violation. Accordingly, Tate is entitled to qualified immunity on Plaintiff's failure to protect claim against him in his individual capacity.

### b.   Defendant Calvin

Viewed in the light most favorable to Plaintiff, the record shows that Plaintiff complained to Calvin that Brown, an inmate from another dorm, would assault him later that day; that Calvin responded by threatening Plaintiff with physical harm and sent Plaintiff back to his cell; that Plaintiff's father called within an hour with the same

information but Calvin still refused to act; that Plaintiff again warned Calvin to no avail; and that within hours Brown assaulted Plaintiff.

While Calvin's response to Plaintiff's complaints could suggest that Calvin knew of a specific threat and failed to take steps to protect Plaintiff, the Eleventh Circuit has recognized that "threats between inmates are common and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm." *Woodyard v. Ala. Dep't of Corr.*, 700 F. App'x 927, 933 (11th Cir. 2017) (quoting *Prater v. Dahm*, 89 F.3d 538, 542 (8th Cir. 1996)). In *Woodyard*, the plaintiff reported that another inmate threatened him, became angry, and threatened to stab the plaintiff. *Id.* at 929. The record was unclear as to whether the plaintiff also told the officer that the inmate threatened to stab the plaintiff that night and whether the plaintiff said the other inmate shoved the plaintiff. *Id.* The officer "brushed off the threat, saying that it was probably just the alcohol talking." *Id.* (footnote omitted). The plaintiff asked permission to report the threat to the shift supervisor, but the officer told the plaintiff he "had to 'wait until the next movement call.'" *Id.* That night, the other inmate attacked the plaintiff, repeatedly stabbing him. *Id.* The Court of Appeals held that the officer was entitled to qualified immunity because it was not clearly established that he violated the Eighth Amendment. *Id.* at 933. "Until binding precedent clarifies the circumstances in which threats between inmates *are* sufficient to allow the jury to impute knowledge of such risks to the officer," the court held, "we cannot say that in the circumstances of this case a refusal to act on a threat (or threats accompanied by drunkenness) amounted to a clearly established constitutional violation." *Id. Woodyard*

was decided in 2017, years after Plaintiff's incident, and therefore it was not clearly established at the time of Plaintiff's attack that an officer violated the Eighth Amendment by brushing off an inmate who reported that an intoxicated inmate shoved and threatened to stab him later that night.

Plaintiff's situation, where both he and his father reported that another inmate intended to attack Plaintiff later that day, perhaps could be seen as more troublesome than the incident in *Woodyard*, where the officer minimized the threat because alcohol was involved and it was unclear if the plaintiff reported the intent to attack that day. On the other hand, there is no evidence that Plaintiff, despite multiple opportunities, specifically explained to Calvin why Plaintiff, who lived in a different dorm than Brown, was having problems with Brown—or why Calvin should find Brown's threats to be credible.

In *Carter v. Galloway*, 352 F.3d 1346 (11th Cir. 2003), prison officials knew the plaintiff's cellmate was a "problem inmate" with a history of disobedience and violence and that the plaintiff said the cellmate "acted crazy, roaming his cell like a 'caged animal." *Id.* at 1349. Although the plaintiff never directly told officers that the cellmate threatened him, they knew the cellmate said he planned to "fake a hanging," and that the plaintiff would help fake the hanging "one way or another." *Id.* at 1349–50. The Eleventh Circuit held that these circumstances were insufficient to create a genuine issue of fact as to whether the prison officials were actually, subjectively aware of a substantial risk of harm to the plaintiff. *Id.* The court further refused to assume prison officials could make the inference from the plaintiff's statements to conclude the "hanging" comment was a threat

21

to the plaintiff, particularly when the plaintiff never told officers he interpreted the statement as a threat to himself. *Id.* at 1350. It held that prison officials were, at most, only negligent in failing to protect the plaintiff from his cellmate's eventual attack, and their "generalized awareness of risk in these circumstances [did] not satisfy the subjective awareness requirement." *Id.*

In *McBride v. Rivers*, 170 F. App'x 648, 655 (11th Cir. 2006), a plaintiff who eventually was attacked by his cellmate previously warned that "me and that dude had problems. I'm in fear for my life. Don't put me in the cell with him." *Id.* The Eleventh Circuit held that the plaintiff did not create a genuine issue of fact as to whether prison officials were subjectively aware of a serious risk of harm to the plaintiff because the plaintiff "did not identify a specific prior incident, from which the defendant could infer that a substantial risk existed." *Id.* Here, Plaintiff similarly claimed only a general threat that Brown would attack him that day and, despite several opportunities, did not tell Calvin why he and Brown were in a dispute or why Plaintiff believed Brown would attack him that day.

Plaintiff's case is unlike that in *Rodriguez v. Sec. Dep't Corr.*, 508 F.3d 611, 614–22 (11th Cir. 2007), where the Eleventh Circuit held that the facts showed that prison officials had subjective knowledge of a serious risk of harm. The plaintiff in *Rodriguez* told prison guards that his former gang threatened him, and he feared they would assault him when he was released into the general population. *Id.* A few hours after being released into the general population, a gang member stabbed him. *Id.* at 616. In contrast, no gangs were

involved in Plaintiff's case, and Calvin was unaware of the nature of Plaintiff's dispute with Brown.

It is Plaintiff's burden to show that Calvin's conduct violated clearly established law when the alleged unconstitutional act occurred in December 2014. *See Gaines*, 871 F.3d at 1208. Plaintiff's case is not one of the rare ones in which it is obviously clear that the officer's acts cannot be lawful. *Id.* at 1209. *Woodyard* is perhaps the closest factually to Plaintiff case, but it was decided in August 2017, years after the incident at issue here. Furthermore, in *Woodward* the Eleventh Circuit held that "[e]ven if [the prison official] *was* aware that [the inmate] had said he would stab [the plaintiff] 'that night' and had shoved him, we are not persuaded that *Rodriguez* clearly established that [the prison official's] response to the situation amounted to deliberate indifference." *Woodyard*, 700 F. App'x at 933. After reviewing the controlling law, this court concludes that there is no binding precedent sufficiently similar to the circumstances of Plaintiff's case to put an officer in Calvin's position on notice in December 2014 that his failure to act in response to Plaintiff's conclusory report of a threat amounted to a clearly established constitutional violation. *See Gaines*, 871 F.3d at 1208–09. Consequently, Calvin is entitled to qualified immunity, and summary judgment is due to be granted on the claim against him in his individual capacity for money damages.

## IV. CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.     Defendants' motion for summary judgment be GRANTED.

2.      Judgment be GRANTED in favor of Defendants.

3.      This case be DISMISSED with prejudice.

4.      The costs of this proceeding be taxed against Plaintiff.

It is further ORDERED that on or before **July 31, 2018,** the parties may file objections to the Recommendation. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file a written objection to the proposed findings and recommendations in the Magistrate Judge's report shall bar a party from a *de novo* determination by the District Court of factual findings and legal issues covered in the report and shall "waive the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions" except upon grounds of plain error if necessary in the interests of justice. 11th Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

DONE this 17th day of July, 2018.

GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE